22   373|
20a  119|

## FISHER v. THE DENVER NATIONAL BANK.

1. ESTOPPEL.
One who obtains or defeats a judgment by pleading or representing an act in one aspect will be precluded from giving it a different and inconsistent character in a subsequent suit upon the same subject; but where the former action was not prosecuted to a termination, or no such advantage was obtained, one who was not a party thereto cannot invoke the rule, although his pleadings in the former case may be received in evidence as affecting his credibility as a witness.

2. IMMATERIAL ERROR.
If the final judgment was right, intermediate mistakes are not of controlling importance.

3. PRINCIPAL AND SURETY.
A valid agreement between the maker and payee of a promissory note extending the time of payment without the surety's consent releases the latter.

4. EVIDENCE.
The mere taking of collateral security, whether it be by note or mortgage, or both, and payable or enforceable after the maturity of the original debt, is not *prima facie* evidence of an extension of payment of the original debt.

*Appeal from the District Court of Arapahoe County.*

Mr. OSCAR REUTER and Mr. A. S. BLAKE, for appellant.

Mr. A. B. MCKINLEY, for appellee.

MR. JUSTICE CAMPBELL delivered the opinion of the court.

This action was instituted by The Denver National Bank, as plaintiff, against John P. Lower and Miers Fisher, upon the following promissory note:

"DENVER COLORADO, Feby 5th, 1890.

"Ninety days after date, for value received, we or either of us promise to pay to the order of The Denver National Bank ten thousand dollars at The Denver National Bank of

Denver, with interest at the rate of eight per cent per annum from date until paid.

" $10,000.00/100        (Signed)        JOHN P. LOWER

                                    " MIERS FISHER."

Judgment by default was entered against Lower. The defendant Fisher filed an answer admitting the execution of the note, and setting up two affirmative defenses as discharging him from liability, the first of which is that by an agreement to that effect he signed the note in question as surety or accommodation maker, and was so accepted by the bank; and that the bank, for a valuable consideration moving from the principal maker, without the knowledge or consent of the surety, extended the time for its payment. The second defense is that by fraudulent pretenses and fraudulent concealment upon the part of the bank and the defendant John P. Lower, practiced upon him (Fisher), he was induced to sign this note as surety, to his injury.

There was a replication denying these affirmative defenses, and upon the issues thus joined there was a trial before a jury, resulting in a verdict and judgment for the plaintiff against Fisher for the amount of the note, from which judgment he appeals.

There was testimony by the defendant tending to show his capacity as surety or accommodation maker, and the plaintiff, in rebuttal of this testimony, offered, and there were received in evidence, the pleadings in a certain suit theretofore pending in the district court of Arapahoe county, wherein the defendant Miers Fisher was plaintiff, and Nix and others were defendants. This suit was instituted by the plaintiff, claiming ownership of the property, to obtain an injunction restraining the defendants from selling, or causing the sale, to be made under execution, upon a judgment against John P. Lower, of certain lots situate on Larimer street in the city of Denver. It was already in evidence that these lots of John P. Lower were redeemed from an execution sale out of the money loaned for this purpose by the bank upon this

note, and the certificate of redemption was taken in the name of George W. Lower, and he at once deeded the property to defendant Fisher, which deed was not then delivered to Fisher, but was recorded by Lower. The evidence leaves it uncertain as to the time when knowledge of this convey-ance or the delivery of the deed was made to Fisher, and it is also uncertain what was the object of the conveyance. The theory of the plaintiff is that this property was bought by Fisher, and that a part of the purchase price was the money received from the bank upon this loan, and hence that Fisher was a joint maker, not a surety upon the note. Fisher upon the trial denied this, and claimed that the con-veyance was made for the convenience of, and as the result of an agreement between, John P. Lower and his son, George, to enable the latter to assist his father in extricating him from his financial difficulties.

In these pleadings, however, Fisher alleges that he bought these lots of George W. Lower, and that a part of the purchase price was the money received upon this note given to the bank by him and John P. Lower. The former suit, how-ever, was never prosecuted to a ter ination, but was dis-missed by the plaintiff, and he gained nothing thereby.

The defendant offered to show by witnesses the real object of this suit, which offer, in effect, if allowed by the court, would have tended to explain or modify the allegations of the pleadings wherein they were at variance with his testi-mony in the present action; but the court conceived that the ground which Fisher took in the former suit, being con-tradictory of his position in the case at bar, absolutely es-topped him in the present case from shifting his ground, or insisting upon either one of the defenses set up in this answer. At the close of the testimony, the court, for the reason stated, instructed the jury to render a verdict against him.

The rule, expressed in various forms, which the court evi-dently had in mind was, as stated in *McQueen's Appeal*, 104 Pa. St. 595: " That where the ground taken by either party to a suit is prejudicial to the other by cutting him off from a

good defense or precluding a recovery in a valid cause of action it will bind the party who adopts it as an equitable estoppel, and will preclude him from shifting his ground in a subsequent suit to the injury of his opponent." Or, as otherwise expressed: " A man who obtains or defeats a judgment by pleading or representing an act in one aspect will be precluded from giving it a different and inconsistent character in a subsequent suit upon the same subject." Other cases to the same effect are: *Railroad Co. v. Howard*, 13 Howard, *307 ; *Martin v. Boyce*, 49 Mich. 122; *Hooker v. Hubbard*, 102 Mass. 239; *Perkins v. Jones*, 62 Iowa, 345 ; *Ogden v. Rowley*, 15 Ind. 56 ; *Hamilton v. Zimmerman*, 5 Sneed, 39 ; *Cooley v. Steele*, 2 Head, 607 ; *Smith v. Fowler*, 12 Lea, 171.

A careful examination of all these cases (unless possibly it be the cases from Tennessee) satisfies us that they are not authority for the ruling of the trial court. Fisher did not succeed in his former suit, nor was the plaintiff in this action a party to it, or injured by it. Had Fisher been successful, or obtained some advantage, the rule contended for would apply; but where, as in this case, he was unsuccessful, and the plaintiff here was not a party there, or injured thereby, and the suit was never prosecuted to a termination, but dismissed, while it was proper in the case at bar to receive in evidence these former pleadings as affecting the credibility of the defendant Fisher, such former declarations would not constitute an estoppel against him, and he should have been permitted, if he could, to explain to the jury the circumstances under which he made the former inconsistent statements. *Hyman v. Wheeler*, 29 Fed. Rep. 347 ; *McLemore v. Nuckolls*, 37 Ala. 662; *Beatty v. Randall*, 5 Allen, 441 ; *McQueen's Appeal, supra.*

The ruling of the court seems not to have been made at the suggestion of appellee, but was the court's own deduction from the authorities.

The appellee, indeed, does not very seriously contend that the defendant Fisher was technically estopped, but argues

that upon the broader grounds of public morals, public policy, and the integrity and dignity of judicial proceedings, the defendant ought not to be permitted in the case at bar to shift his ground; but no well reasoned case so holding has been called to our attention, and we know of no principle of law that would have such effect.

Notwithstanding this court may find error in the ruling of the trial court, the appellee strenuously insists that, under the evidence in this case, Fisher was a joint maker, and not a surety, or, if the latter, that the time of payment was not extended, and for these reasons was not entitled to have his defense based on suretyship submitted to the jury. Upon the ground that as the ultimate ruling was right, the intermediate mistakes are not of controlling importance, the appellee asks that the judgment be affirmed. Elliott on Appellate Procedure, sec. 590; 2 Thompson on Trials, secs. 2404, 2406.

Whether the presumption be that prejudicial error resulted from the wrong ruling, or that the record must affirmatively show that such ruling resulted in prejudice to the defeated party, it is very clear that, to affirm the judgment, it must appear that there was no competent or sufficient evidence in support of either one of the affirmative defenses of the answer. If there was any satisfactory evidence to sustain the allegations of either, the case should have been submitted to the jury for their findings. To determine this question demands a careful examination of the entire record.

The second defense is not that the creditor and principal altered the surety's contract without his consent. The cases like *Watriss v. Pierce*, 32 N. H. 560, cited to the effect that this would discharge the surety, are, therefore, not in point, although unquestionably stating correct propositions of law. The defense sought to be set up is that by fraudulent conduct upon the part of the creditor and the principal, committed before the note was given, the surety was induced to sign this note, which he would not have done had he known the true nature of a secret contract between them. This

defense, however, is not complete, for there is no allegation that, if all the facts known to the payee and the principal maker had been communicated to the surety, he would not have signed the note, or that he has been injured by signing. Assuming, however, that the defense is well pleaded, we proceed to consider the claim that there is testimony tending to establish it.

The defense is that the plaintiff and the defendant John P. Lower, knowing that the defendant Fisher objected to signing a note bearing more than eight per cent interest per annum, falsely pretended to Fisher that the bank would loan money to Lower upon a note drawing interest only at eight per cent, if he (the defendant Fisher) would sign the note as surety, or for the accommodation of Lower; and that, relying upon such representation, Fisher did sign the note as surety; whereas, in truth, at the very time, Lower was under a secret, but binding, contract with the plaintiff to pay upon the note interest at the rate of ten per cent per annum, which agreement further required the bank and Lower to keep such information secret from the defendant; that both the bank and Lower carried out this secret contract, and by reason thereof increased Fisher's risk upon the note, and the performance of the secret contract by Lower, in connection with other matters, rendered him insolvent.

The evidence in support of this defense falls far short of sustaining it. Indeed, there is no competent evidence at all to support it. The bank did not agree to, nor did it, loan the money at a less rate of interest than ten per cent. Fisher, however, testifies that at first his codefendant Lower brought to him a note bearing interest at ten per cent, which he refused to sign, and that afterwards he brought him another note drawn to bear interest at eight per cent per annum, stating that by reason of certain arrangements he had made with the bank it would not be necessary for Fisher to sign a note bearing interest for more than eight per cent, and thereupon the note in question was signed.

If this conduct of Lower can be tortured into a fraud, cer-

tainly the bank knew nothing of it and did not participate in it, and the opportunity was given to Fisher, if he saw fit, to inquire further into the nature of the alleged secret arrangement. Then, too, Mr. Butler, who must be considered as his agent in negotiating this loan, knew of this arrangement for the payment of extra interest and did not object to it, and the bank was justified in supposing that Fisher also knew it. There was no understanding between the payee and the alleged principal that information of this separate contract should be withheld from Fisher; nor is there any evidence that had he known of it he would have declined to sign the note; nor that the performance of the contract in any way affected the insolvency of Lower, because he was hopelessly insolvent before. This separate agreement, of itself, is not sufficient to discharge the surety. *Tremper v. Hemphill et al.*, 8 Leigh (Va.), 623; *Huff v. Cole*, 45 Ind. 300; *Burks v. Wonterline et al.*, 6 Bush (Ky.), 20; Brandt on Suretyship, etc., sec. 331.

It follows that under this defense there was no evidence to go to the jury.

Upon the question of the capacity in which Fisher signed the note, the evidence is conflicting. Assuming that Fisher may show, and has shown, that, although apparently signing as a joint maker, he, nevertheless, in reality signed as a surety or accommodation maker, the question then arises, was there, by a valid agreement between the bank and John P. Lower, an extension of the time of payment? For it is elementary that if, in a case of this sort, time is given by the payee to the principal debtor for the payment of the note without the consent of the surety or accommodation maker, or without reserving the right to proceed against him at any time, the surety or accommodation maker is discharged. Tiedeman on Commercial Paper, sec. 422, *et seq.*; 2 Daniels on Negotiable Instruments, secs. 1332a, 1333; 2 Randolph, secs. 474, 901, 907, 910, 954, *et seq.; Barron v. Cady*, 40 Mich. 259.

As to this alleged extension of the time, the facts and circumstances are as follows: After the original note matured,

the bank was anxious for, and was pressing both of the makers for, payment, and sent them notices of their default; and frequent conferences took place between the officials of the bank and John P. Lower to hasten payment. Fisher was desirous of being relieved from his liability upon the note, and had an interview with George W. Lower, the son of John P. Lower, with this end in view. Finally it was agreed between them that George W. Lower, if the bank should release Fisher, would give to the bank his own note, secured by a trust deed upon real estate which he owned in the city of Denver.

Thereupon George W. Lower, on behalf of his father, consulted Hugh Butler, as his agent, to negotiate with the bank for the purpose of accomplishing this object. Mr. Butler presented this matter to the bank, but the bank officials at once refused to release Fisher, but expressed a willingness to take this additional security by way of collateral upon the principal debt.

Butler reported the result of the interview to George W. Lower, and thereupon Lower, without any further consultation with Fisher, executed a note payable to Thatcher, the president of the bank, and a trust deed to Denman, the cashier, and delivered them to Butler, who in turn delivered them to the president of the bank as collateral security upon the original loan.

George W. Lower claims that his understanding of the arrangement, as reported to him by Mr. Butler, was that the time of payment of the original note was extended until the maturity of the collateral note, which the bank denies, but admits taking the security as collateral.

From this transaction alone, the appellant insists that the presumption of law, subject, of course, to rebuttal by the holder, is that the time of payment of the original note was extended until the collateral note matured, and until the trust deed might rightfully be foreclosed for default in complying with its provisions. In support of these propositions are cited: 2 Daniels, sec. 1329, and cases cited; 2 Parsons,

Notes & Bills, 247; *Okie v. Spencer*, 2 Wharton, 252. Some of these cases, as well as the text-books, so declare; but other cases cited in the text-books to this point show that there was an express agreement for the extension of time upon valuable considerations, other than the mere giving of collateral, or that the new note was taken in payment of the original.

As holding that the mere taking of such collateral security does not extend the time of payment of the original debt, as well as that the extension must be for some definite period of time, are: 2 Randolph, secs. 960–968; *United States v. Hodge*, 16 U. S. 681; *Miller v. Knight*, 6 Baxter (Tenn.), 503; *Cary v. White*, 52 N. Y. 138; *Frois v. Mayfield*, 33 Tex. 801; *Brengle v. Bushey*, 40 Md. 141.

Probably the apparently conflicting authorities may be reconciled by giving effect to the presumption, where the new note is given, or the new note and mortgage are given, and so received, in payment of, or for and on account of, the pre-existing debt; and withholding the presumption, where the new security is taken merely as collateral.   See Hare & Wallace's notes to *Okie v. Spencer*, 2 Am. Leading Cases, 276.

We think it the safer rule, and the one resting upon principle, and so hold, that the mere taking of collateral security, whether it be a note or mortgage or both, and payable or enforceable after the maturity of the original debt, is not, of itself, *prima facie* evidence of an extension of the time of payment of the original debt.   Aside from this mere taking of collateral, there is not, as we read the record, any competent or sufficient evidence of this alleged agreement of extension.

The witness Butler was in no sense an agent of the bank, either in the negotiation of the loan, or in the taking of collateral; and he and the officials of the bank testify that in the taking of the collateral the bank did not in any way preclude itself from suing upon the original debt at any time it saw fit to do so.

The only uncertainty or confusion arising in this case re-

sults from the admission in evidence of purported declarations by Mr. Butler, as testified to by George W. Lower, in a measure at variance with this testimony.   Such evidence was not properly in the record for the reason that the agency was not established, and the declarations of an alleged agent are not, of themselves, sufficient to establish the agency, although the alleged agent himself may testify upon this question.

It is said, however, that inasmuch as George W. Lower requested Butler to make to the bank only the proposition that he would give this collateral security in consideration of the release from liability of Fisher upon the original note, the agency ceased when the bank refused to accept the same; and that when Butler, at the request of Thatcher, conveyed to George W. Lower the information that the bank was willing to accept this security merely as collateral upon the original loan, that thereby in the subsequent arrangements Butler ceased to be agent for Lower, and became the agent of the bank in the matter of taking this collateral security; and that any declarations, therefore, made by Butler as to what was the contract or agreement by the bank, if any, in the taking of this collateral, were binding upon the bank.

This, however, is not the law; and there is not a word of evidence in the record that either Butler or the bank considered that Butler, in this matter, was acting as the bank's agent.   If an owner of real estate employs an agent to sell it, and this agent, acting for the owner, makes to a proposed purchaser a proposition to take a certain price for the property, payable in cash, and the proposed purchaser declines 'this proposition and submits a counter proposition to take the property at the price named, but to pay one half in cash, and the balance in one year, giving his note therefor to be secured by a mortgage upon the property, and the agent submits to the owner this proposition, and it is thereupon accepted and the transaction closed upon that basis, it would scarcely be contended that the agent thereby changed his relations and ceased to be the agent of the owner and became

the agent of the purchaser.   That is, in principle, the same as the transaction here; and, as we have seen, unless Butler was the agent of the bank in taking the collateral, there is no evidence at all in this record of an extension of the time of payment of the original debt.

As an additional circumstance negativing the idea of extension, it can scarcely be conceived that a business man of ordinary prudence would refuse to release Fisher from liability upon the note in consideration of the collateral security offered, and, in the same connection and at the same time, agree to receive this new security as collateral for the original debt, and as a consideration therefor extend the time of payment of the preëxisting debt, which, as a matter of law, he must be supposed to know would release Fisher from all liability unless he gave his consent to the extension.

We are of opinion, therefore, upon an examination of the entire record, that although the court was wrong in its theory, and directed a verdict upon an erroneous ground, yet that there was no satisfactory or sufficient evidence to submit to the jury under either one of the defenses in the answer; and that, if the case had been submitted to the jury upon this evidence, and a verdict returned in favor of the defendant, it would have been the duty of the court to set aside that verdict, on the ground that there was no competent or sufficient evidence to support it.   For these reasons the judgment of the court should be affirmed.

*Affirmed.*